UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
...........................................................................

JOSEPH EHRENREICH, JUDY EHRENREICH

Plaintiffs,

v.

3COM CORPORATION,

Defendant.

..........................................................................X

'09 CIV 4487

COMPLAINT

JURY TRIAL DEMANDED

Plaintiffs Joseph Ehrenreich and Judy Ehrenreich, as for their Complaint against 3Com Corporation, allege as follows:

## NATURE OF ACTION

1.      Plaintiffs are bringing this action to recover damages caused by Defendant's violation of Section 10(b) of the Securities Exchange Act of 1934 and rule 10b-5 promulgated thereunder.  The allegations in this Complaint are based on Plaintiff's personal knowledge as to themselves and on information and belief (including the investigation and review of publicly available information) as to all other matters.

## JURISDICTION

2.      The court has jurisdiction under the provisions of 28 U.S.C. § 1331 because this action arises under the provisions of Section 10(b) of the Securities Exchange Act of 1934.

1

## VENUE

3.      Venue is proper in the district pursuant to 15 U.S.C.A. § 78aa because 3Com Corporation transacts business in the district in that it maintains an office in the district.

## PARTIES

4.      Plaintiff Joseph Ehrenreich is an individual, residing at 15 Elm Street, Woodmere, NY 11598.

5.      Plaintiff Judy Ehrenreich is an individual, residing at 15 Elm Street, Woodmere, NY 11598.

6.      Defendant 3Com Corporation ("3Com") is a Delaware corporation with its principal executive offices located at 350 Campus Drive, Marlborough, Massachusetts 07152.  3Com's common stock is traded on the NASDAQ Global Select Market.

## THE SECURITIES EXCHANGE ACT OF 1934

7.      Section 10(b) of the Securities Exchange Act of 1934 (the "'34 Act") makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

8.      Enacted pursuant to the '34 Act, Rule 10b-5 provides that

2

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

To employ any device, scheme, or artifice to defraud,
To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

## FACTS

**3Com Announces Agreement To Be Acquired by Bain Capital Partners; Assures Investors that Regulatory Conditions to the Merger are all "Customary"**

9.      On September 28, 2007, 3Com issued a press release announcing that it had "signed a definitive merger agreement to be acquired by affiliates of Bain Capital Partners, LLC, a leading global private investment firm, for approximately $2.2 billion in cash."

10.     The press release also indicated that the purchase price was $5.30 per share and that "This represents a premium of approximately 44 percent over 3Com's closing price of $3.68 on September 27, 2007."

11.     In the September 28 press release, 3Com assured investors that the closing of the transaction was subject to only "customary" regulatory approvals and conditions. More specifically, 3Com stated that:

> The transaction is expected to be completed by the first quarter of calendar year 2008, subject to receipt of 3Com shareholder approval, **customary** regulatory approvals and other **customary** closing conditions.

(emphasis added)

12.     In the foregoing single sentence, 3Com utilized the word "customary" not once but twice. 3Com was clearly assuring investors that the required regulatory approvals were all "customary" and that the transaction would not encounter any significant regulatory roadblocks.

13.     The foregoing assurance given by 3Com was false and misleading. In fact, as detailed below, the proposed merger raised serious national security concerns. These concerns triggered regulatory roadblocks which eventually caused the deal to fail. These regulatory roadblocks cannot by any stretch be characterized as "customary."

14.     Furthermore, as detailed below, 3Com recognized from the very beginning that the merger might be barred by federal authorities due to national security concerns. In fact, as detailed below, the possibility that the deal would be blocked on national security concerns was a central issue in the negotiation of the merger agreement.

**3Com Fails To Disclose Serious National Security Concerns**

15.     In the September 28 press release, 3Com disclosed that "As part of the transaction, affiliates of Huawei Technologies will acquire a minority interest in the company and become a commercial and strategic partner of 3com."

16.     While disclosing that Huawei Technologies ("Huawei") would have an interest in the transaction, 3Com failed to provide any further information concerning Huawei. In particular, 3Com failed to disclose that Huawei is a Chinese company with alleged close ties to the Chinese military.

17.     The following information concerning Huawei appeared in *Money Morning* (moneymorning.com) on October 4, 2007:

4

Huawei, a privately held firm based in the southern China city of Shenzhen, is China's largest network-equipment company.... Unfortunately, it doesn't have a pristine reputation. Its highly reclusive CEO, Ren Zhengfei, is a former officer in the People's Liberation Army - the Chinese military. The company was founded in 1988 and got its start building military communications networks for the Chinese army. That's bad enough, but Ren and other company officials now repeatedly deny that there is any kind of a connection between Huawei and the PLA - a protestation virtually no one believes.

18.     Huawei's involvement in the transaction raised serious national security

concerns. An article in *The Washington Times* on October 3, 2007 described some of

these concerns:

A Chinese company with ties to Beijing's military and past links to Saddam Hussein's army in Iraq and the Taliban will gain access to U.S. defense-network technology under a proposed merger, Pentagon officials say.

Huawei Technologies will merge with the Massachusetts-based 3Com network-equipment manufacturer in a deal announced last week. Huawei has been linked to the U.N. oil-for-food scandal, which involved millions of dollars in payoffs to Saddam's regime during a time of U.N. sanctions....

"Huawei is up to its eyeballs with the Chinese military," said a defense official concerned about the deal. Huawei was founded in 1988 by a Chinese military officer and got its start building military communications networks....

3Com, through a subsidiary, provides the Pentagon and the Army with intrusion-detection equipment, and the merger potentially will provide Huawei access to strategic computer-network vulnerabilities, said defense officials speaking on the condition of anonymity....

Defense officials said Huawei's past is the main cause for concern. Huawei technicians were involved in violating U.N. sanctions against Iraq in the early 2000s by illegally providing a fiber-optic network in Iraq that linked the Iraqi military's air-defense network....

Huawei also was involved in building a telephone-switching system in Kabul, Afghanistan, for the ruling Taliban militia prior to its ouster in 2001, according to U.S. intelligence officials....

**Background to Exon-Florio/CFIUS Review**

19.     Section 721 of the Defense Production Act of 1950, as amended, is

commonly referred to as the "Exon-Florio provision."

20.    The Exon-Florio provision gives the President authority to block a merger if he determines that, as a result of the merger, a "foreign interest exercising control might take action that threatens to impair the national security."

21.    The Exon-Florio provision is implemented by the Committee on Foreign Investment in the United States ("CFIUS"), an inter-agency committee chaired by the Secretary of the Treasury.   The President has largely delegated to CFIUS the review process contemplated by the Exon-Florio provision.

22.    The Exon-Florio provision does not mandate that a company involved in a merger make any filing or provide any notice to CFIUS.   However, a company may voluntarily request a CFIUS review.   In addition, CFIUS may initiate a review even if it does not receive a request.

23.    3Com originally hoped to avoid a CFIUS review. However, adverse press articles relating to the Huawei connection forced 3Com to change its plans and request a CFIUS review.

24.    The information in the preceding paragraph is based on an Affidavit submitted by Craig Boyce, a principal of Bain Capital, in connection with litigation that is currently pending in the Delaware Court of Chancery between 3Com and an affiliate of Bain Capital, Diamond II Holdings, Inc. ("Bain Affiliate").   Specifically, Mr. Boyce states in paragraph 6 of his Affidavit:

Shortly after the transaction was announced, there were a number of articles, editorials, and statements by public officials condemning any investment by Huawei in an American telecommunication company. Some of the articles reported leaks from unnamed defense officials suggesting that Huawei had strong ties to the Chinese military and/or possible links to Chinese cyber warfare against the United States and the United States military. Bain Capital and 3Com promptly decided to submit the 3Com transaction for CFIUS review.

**3Com Eventually Discloses CFIUS Filing, Omits Underlying National Security Concerns**

25.     On October 4, 2007, 3Com filed a Report on Form 8-K disclosing that

3Com intended to make a CFIUS filing. This 8-K contained the following disclosure:

> Today 3Com confirmed that it will make a joint voluntary filing of this transaction (together with Bain Capital) with the Committee on Foreign Investment in the United States, or CFIUS. CFIUS, an inter-agency committee chaired by the Secretary of the Treasury, reviews foreign investments in U.S. companies to determine whether they might pose a threat to U.S. national or homeland security.

26.     While disclosing that it would request a CFIUS review, 3Com failed to

disclose the factors which prompted its decision to request this review. There is no hint in

the 8-K that 3Com's decision was prompted by national security concerns relating to

Huawei, including allegations that Huawei had strong ties to the Chinese military and/or

possible links to Chinese cyber warfare against the United States and the United States

military. There is also no hint that there was a real risk that CFIUS would block the

transaction because of these national security concerns. Instead, 3Com blithely assured

investors that:

> 3Com and Bain Capital believe that the transaction will not result in foreign control of the new company and does not pose a threat to U.S. national or homeland security.

7

27.     The foregoing statement in the 8-K, together with the assurance in the

September 28 press release that the transaction was subject to only "**customary**

regulatory approvals and other **customary** closing conditions," gave the false impression

that the CFIUS review was only a customary formality.

**3Com Discloses CFIUS Obstacles, Stock Price Plummets**

28.     On February 20, 2008, 3Com issued a press release announcing that it had

encountered problems relating to CFIUS review of the merger.  This press release

included the following disclosure:

> 3COM AND BAIN CAPITAL PARTNERS ANNOUNCE MUTUAL
> WITHDRAWAL OF CFIUS APPLICATION
>
> MARLBOROUGH, MA — February 20, 2008 — 3Com Corporation
> (NASDAQ: COMS) today announced that the company along with affiliates of
> Bain Capital Partners, LLC and Huawei Technologies have withdrawn their joint
> filing to the Committee on Foreign Investment in the United States
> (CFIUS) concerning the parties' proposed merger transaction. The parties remain
> committed to continuing discussions.
>
> "We are very disappointed that we were unable to reach a mitigation
> agreement with CFIUS for this transaction," said Edgar Masri, President and CEO
> of 3Com Corporation. "While we work closely with Bain Capital Partners and
> Huawei to construct alternatives that would address CFIUS' concerns, we will
> continue to execute our strategy to build a global networking leader. We remain
> focused on serving our growing base of worldwide customers and providing them
> with innovative solutions that deliver long-term investment for their network
> infrastructure and offer them a lower total cost of ownership."

29.     The foregoing announcement issued on February 20, 2008 caused the

price of 3Com common stock to immediately plummet by 23%.  Specifically, the price of

3Comm stock declined from $3.73 per share (the closing price on February 19, 2008) to

$2.87 per share (the closing price on February 20, 2008).

**3Com Discloses CFIUS Filing Withdrawn, Stock Price Plummets**

30.     On March 19, 2008, 3Com informed the world that it had been unable to

resolve the problems relating to CFIUS review.  3Com's March 19 press release included

the following disclosure:

> 3Com and affiliates of Bain Capital and Huawei Technologies made a
> joint voluntary filing with the Committee on Foreign Investment in the United
> States (CFIUS) in connection with the proposed merger transaction. The parties
> withdrew their joint filing after they were unable to reach a mitigation agreement
> with CFIUS to address concerns raised by CFIUS, and no application has been re-
> submitted to date.  Since the withdrawal, 3Com, Bain Capital Partners and
> Huawei Technologies have been working to construct alternatives that would
> address CFIUS' concerns. To date, the parties have been unable to agree upon an
> alternative transaction that addresses CFIUS' concerns and is acceptable to
> 3Com's Board of Directors....
>
> At the time they withdrew their joint application, the parties notified
> CFIUS that they would not go forward with the proposed transaction in the form
> presented to CFIUS, which included a minority investment by affiliates of
> Huawei Technologies in 3Com. Accordingly, there can be no assurance that the
> parties will be able to close the merger transaction contemplated by the existing
> merger agreement, even if the merger agreement is approved by 3Com's
> shareholders.  Additionally, there can be no assurance that the parties will reach
> agreement on an alternative transaction that both addresses concerns raised by
> CFIUS and is acceptable to 3Com.

31.     The foregoing announcement issued on March 19, 2008 caused an

immediate 22% decline in the price of 3Com common stock.  Specifically, the price of

3Comm stock declined from $2.86 per share (the closing price on March 18, 2008) to

$2.22 per share (the closing price on March 19, 2008).

**Bain Terminates Merger Agreement, 3Com Stock Price Plummets**

32.     On March 20, 2008, Bain Capital Partners ("Bain") announced that it was

terminating the Merger Agreement with 3Com because CFIUS had made clear that it

would act to block the merger.

33.     Bain issued the following press release explaining its actions:

Bain Capital Terminates Merger Agreement with 3Com
Thursday March 20, 1:33 pm ET

BOSTON--(BUSINESS WIRE)--An affiliate of Bain Capital Partners, LLC today
advised 3Com Corporation (NASDAQ:  COMS - NEWS) that it is terminating the
Merger Agreement with the company because the U.S. Government's Committee
on Foreign Investment in the United States (CFIUS) said it intended to take action
to prohibit that transaction.

On September 28, 2007, 3Com announced that it had entered into a definitive
agreement under which 3Com would be acquired by an affiliate of Bain Capital
Partners, a global private investment firm, in a transaction with a total equity
value of $2.2 billion. The proposed transaction included Huawei Technologies, a
commercial partner of 3Com, taking a small minority stake in the business. The
transaction was subject to the receipt of regulatory and shareholder approval, as
well as other customary closing conditions.

3Com and affiliates of Bain Capital and Huawei Technologies made a joint
voluntary notice with CFIUS in connection with the proposed merger transaction.
The parties advised CFIUS they decided to withdraw their notice because CFIUS
made clear that it intended to take action to prohibit the proposed transaction.

"Bain Capital made several alternative proposals to 3Com that we believe could
have satisfied the concerns raised by CFIUS," the firm said. "We regret that we
were unable to agree upon an alternative transaction."

34.     The foregoing announcement issued on March 20, 2008, caused an

immediate further 10% decline in the price of 3Com common stock.  Specifically, the

price of 3Comm stock declined from $2.22 per share (the closing price on March 19,

2008) to $1.98 per share (the closing price on March 20, 2008).

**Litigation Papers Reveal 3Com Anticipated but Failed To Disclose CFIUS Obstacle**

35.     Following the failure of the merger, 3Com commenced an action against

Bain Affiliate to recover a termination fee.  The papers filed in this litigation reveal that

3Com knew from the very beginning that CFIUS might block the merger due to national

security concerns relating to Huawei.  These papers also reveal that the risk relating to

CFIUS figured prominently in the negotiation of the merger agreement.   Set forth below

are relevant excerpts from these papers.

36.     The complaint filed by 3Com indicates that the parties clearly

contemplated that CFIUS could block the merger.  Specifically, the 3Com complaint

states in paragraphs 11 and 12:

> The parties extensively negotiated the Merger Agreement's terms—including the
> Newco Termination Fee provision—at arms length.  The Newco Termination Fee
> addressed risks that were clearly contemplated by the parties, and expressly
> allocated those risks.
>
> Through the Newco Termination Fee provision, the parties expressly allocated *to
> Newco* the risk that the Merger would not be consummated by April 28, 2008 **in
> the event that CFIUS indicated an intent to take action to prevent the
> Merger.**

(emphasis added)

37.     Similarly, the brief filed by 3Com in support of its Motion for Summary

Judgment states (p. 20):

> **The parties expressly allocated *to Newco* the risk that CFIUS would
> communicate its intent to take action to prevent the Merger,** but no "final and
> non-appealable" Order blocking the Merger would be issued and the Merger
> would not be consummated by April 28, 2008.

(emphasis added)

38.     The papers filed by Bain Affiliate also indicate that the parties were well aware of the possibility that CFIUS might block the merger.  For example, the Brief filed by Bain Affiate in Opposition to 3Com's Motion for Summary Judgment states (p. 7):

> The parties focused in particular on two issues relating to CFIUS review:  (a) the possibility that the Chinese technology company Huawei might not cooperate fully with the detailed and sometimes intrusive CFIUS review process and (b) the possibility that, even with the full cooperation of all parties, CFIUS might nonetheless prevent the Merger from going forward.

39.     Similarly, an Affidavit filed by Craig Boyce (the "Boyce Affidavit"), a principal of Bain, shows that that the parties were well aware of the national security implications of the Huawei connection.  Specifically, the Boyce Affidavit states in paragraph 6:

> The negotiations between the parties leading up the execution of the Merger Agreement on September 28, 2007 presented a number of issues, two of which specifically involved CFIUS....The parties recognized the possibility that the presence of Huawei in the purchaser group might require CFIUS to review and to investigate the transaction to determine whether it threatened the national security of the United States.

40.     The Boyce Affidavit also makes clear that the parties recognized that the merger could be blocked by CFIUS.  For example, the Affidavit states in paragraph 8:

> The parties also recognized the issue or possibility that even if there was complete cooperation by Bain Capital, Huawei, and 3Com with CFIUS, the transaction could be barred by federal authorities....

**3Com's Use of Code Words in Merger Agreement Concealed CFIUS Risks**

41.     In the litigation referred to above, 3Com asserts that Bain Affiliate is required to pay a $66 million termination fee.  3Com predicates its claim on Section 8.3(c)(iii) of the merger agreement, which provides in pertinent part:

12

> Newco shall pay to the Company the Newco Termination Fee…, in the event that… **a U.S. Federal regulatory agency (that is not an antitrust regulatory agency)** has informed Newco, Merger Sub or the Company (or their Representatives) that it intends to take action to prevent the Merger.

(emphasis added)

42.     3Com's complaint indicates that the foregoing provision was specifically negotiated to address the risks relating to CFIUS.  For example, the 3Com complaint states in paragraphs 12 and 13:

> Through the Newco Termination Fee provision the parties expressly allocated to Newco the risk that the merger would not be consummated by April 28, 2008 **in the event that CFIUS indicated an intent to take action to prevent the merger**….3Com now seeks the benefit of the bargain that was struck, and to require Bain Capital's Newco to live up to its commitments in the Merger Agreement by paying the Newco Termination Fee.

(emphasis added)

43.     While Bain disagrees with 3Com's interpretation of section 8.3(c)(iii) of the merger agreement, Bain acknowledges in its litigation papers that such section was specifically negotiated to address risks relating to CFIUS.

44.     If one reads section 8.3(c)(iii) of the merger agreement, one will not find even a single reference to CFIUS.  This is exceedingly odd given that both 3Com and Bain acknowledge that this section was specifically negotiated and drafted to address the risks relating to CFIUS.

45.     How then does section 8.3(c)(iii) address the risks relating to CFIUS without ever mentioning CFIUS?  The answer is that 3Com used obscure code words to refer to CFIUS.  Specifically, section 8.3(c)(iii) addresses the possibility that "a U.S. Federal regulatory agency (that is not an antitrust regulatory agency)" would block the merger.  The litigation papers make clear that this obscure phrase was a code word for CFIUS.

46.     The use of these obscure code words to refer to CFIUS concealed from the reader that the parties to the merger agreement recognized from the very beginning that the merger might be blocked by CFIUS on national security grounds.

## 3COM'S MATERIAL MISTATEMENTS AND OMISSIONS

**Misleading Statements in September 28 Press Release**

47.     As detailed above, the possibility that CFIUS would block the merger was recognized by the parties from the very beginning and was central to the negotiation of the merger agreement.  However, 3Com's September 28 press release announcing the merger completely concealed this risk and conveyed the clear impression that the merger would not encounter any unusual regulatory roadblocks.

48.     More specifically, 3Com's September 28 press release included the following sentence describing the regulatory approvals required in connection with the merger:

> The transaction is expected to be completed by the first quarter of calendar year 2008, subject to receipt of 3Com shareholder approval, **customary** regulatory approvals and other **customary** closing conditions.

(emphasis added)

49.    In the foregoing single sentence, 3Com utilized the word "customary" not once but twice. 3Com conveyed the clear impression that this was a typical deal that was not expected to encounter any unusual regulatory roadblocks.

50.    The foregoing sentence was materially misleading because it omitted to disclose that in fact there was a substantial risk that the transaction would be blocked by CFIUS due to national security issues relating to Huawei.

51.    The risk relating to CFIUS cannot by any stretch be characterized as "customary." A CFIUS review is a very rare occurrence. For example, in 2007, there were 11,219 announced acquisition transactions involving US companies, according to research firm Thompson Financial. Fewer than 1% of these transactions involved a CFIUS review. Even among transactions involving a foreign buyer, a CFIUS review impacts only a small portion of transactions. In a speech given on February 27, 2008, Deputy Secretary Robert M. Kimmitt remarked:

> And I would note that CFIUS affects only a small portion of all international investment into the United States. In 2007, CFIUS reviewed fewer than eight percent of M&A transactions in the United States involving a foreign acquirer and a domestic firm.

52.    Given that 3Com was well aware of the risk that CFIUS would block the merger, 3Com's assurance that the merger was subject to only "customary" regulatory conditions was false and misleading.

**Misleading Statements in October 4, 2007, 8-K Filing**

53.     As detailed above, 3Com had originally hoped to avoid making a CFIUS

filing.  However, 3Com was forced to change its plans after the press began to highlight

the national security issues relating to Huawei.  The foregoing is based on the Boyce

Affidavit, which states in paragraph 6:

> Shortly after the transaction was announced, there were a number of articles,
> editorials, and statements by public officials condemning any investment by
> Huawei in an American telecommunication company.  Some of the articles
> reported leaks from unnamed defense officials suggesting that Huawei had strong
> ties to the Chinese military and/or possible links to Chinese cyber warfare against
> the United States and the United States military.  Bain Capital and 3Com
> promptly decided to submit the 3Com transaction for CFIUS review.

54.     On October 4, 2007, 3Com filed an 8-K disclosing that it intended to make

a CFIUS filing.  This 8-K contained the following disclosure:

> Today 3Com confirmed that it will make a joint voluntary filing of this
> transaction (together with Bain Capital) with the Committee on Foreign
> Investment in the United States, or CFIUS. CFIUS, an inter-agency committee
> chaired by the Secretary of the Treasury, reviews foreign investments in U.S.
> companies to determine whether they might pose a threat to U.S. national or
> homeland security.

55.     While disclosing that it would request CFIUS review, 3Com failed to

disclose the factors that prompted 3Com's decision to make such request.  There is no

hint in the 8-K that Huawei's involvement in the transaction raised serious national

security concerns.  There is no hint that there was a real risk that CFIUS would block the

transaction because of these concerns.   Instead, 3Com blithely assured the reader that:

> 3Com and Bain Capital believe that the transaction will not result in foreign
> control of the new company and does not pose a threat to U.S. national or
> homeland security.

16

56.     The foregoing statement in the 8-K, together with the assurance in the September 28 press release that the transaction was subject to only "**customary** regulatory approvals and other **customary** closing conditions," gave the impression that the CFIUS review was only a customary formality. This impression was false. In fact, as detailed above, the parties recognized from the very beginning that there was a real risk that CFIUS would block the transaction.

57.     The foregoing statement in the 8-K is materially misleading because it omitted to disclose each of the following:

> --3Com's decision to make the CFIUS filing was prompted by national security concerns relating to Huawei, including allegations that Huawei had strong ties to the Chinese military and/or possible links to Chinese cyber warfare against the United States and the United States military;

> --the national security issues relating to Huawei created a significant risk that CFIUS would block transaction;

> --the possibility that CFIUS would block the merger was recognized by the parties from the very beginning and was central to the negotiation of the merger agreement.

## SCIENTER

### 3Com Senior Executive Neal Goldman Was Aware of CFIUS Obstacle

58.     Neal Goldman serves as 3Com's Executive Vice President and Chief Administrative and Legal Officer. He also serves as Secretary.

59.     Mr. Goldman was 3Com's lead negotiator in connection with the merger agreement. In that capacity, he personally negotiated the provisions of the merger agreement relating to CFIUS. The foregoing is based on the Boyce Affidavit, which states (paragraph 6):

> Neal Goldman, 3Com's Chief Administrative Officer and Secretary, was the lead negotiator for 3Com and therefore the person with whom I primarily negotiated the Merger Agreement, including those sections addressing the possibility of an application by the parties to CFIUS for approval of the transaction....

60.     As detailed above, the possibility that CFIUS might block the merger was central to the negotiation of the merger agreement and was specifically addressed by the parties in the merger agreement. Given that Mr. Goldman was 3Com's lead negotiator on the issues relating to CFIUS, there is a strong inference that Mr. Goldman was fully aware of the risk that CFIUS would block the merger due to national security concerns relating to Huawei.

**Neal Goldman Signed Misleading 8-K**

61.     As detailed above, 3Com issued a misleading press release on September 28, 2008. On the same day, 3Com filed the press release with the SEC as part of a Report on Form 8-K. Mr. Goldman signed this 8-K on behalf of 3Com. The fact that Mr. Goldman signed this 8-K gives rise to a strong inference that Mr. Goldman read and approved the misleading press release that was included as part of such 8-K.

62.     As detailed above, 3Com filed a misleading Report on Form 8-K on October 4, 2008. Mr. Goldman signed this 8-K on behalf of 3Com. The fact that Mr. Goldman signed this 8-K gives rise to a strong inference that Mr. Goldman read and approved the content of this 8-K, including the misleading provisions contained therein.

63.     Given that Mr. Goldman was fully familiar with the risks relating to CFIUS, he was at best exceedingly reckless in approving the misleading disclosures which concealed such risks.  However, as detailed below, the evidence indicates that the misleading statements reflect deliberate concealment and not mere recklessness.

**3Com's Pattern of Misleading Statements**

64.     As detailed above, the provisions of the merger agreement which were specifically negotiated to address the risks relating to CFIUS do not refer to CFIUS even a single time.   Instead, such provisions use the obscure phrase "a U.S. Federal regulatory agency (that is not an antitrust regulatory agency)" to refer to CIFIUS.

65.     The use of obscure "code words" to refer to CFIUS in the merger agreement gives rise to a strong inference that 3Com deliberately sought to conceal the risks relating to CFIUS.

66.     The misleading statements in the press release and 8-K were not isolated instances, but rather continued the concealment that began with the merger agreement. This pattern of concealment gives rise to a strong inference that the misleading statements were made deliberately with a view towards concealing the true risks relating to CFIUS.

**3Com's Executives Had Financial Incentive To Issue the Misleading Statements**

67.     Why did 3Com use obscure code words in the merger agreement which concealed the risk relating to CFIUS?  The likely answer, as detailed below, can be found in the structure of the Exon-Florio provision.

68.     The Exon-Florio provision does not require that a party to a merger make any filings with, or give any notice to, CFIUS.  Nor does it mandate that CFIUS review any particular type of transaction.   In this respect, the Exon-Florio provision is very different from other regulatory regimes, such as the anti-trust laws for example, which mandate that specific filings be made to the applicable regulatory authority.

69.     Given the peculiar structure of the Exon-Florio provision, a party has an incentive to keep a low profile in order to maximize the chances of avoiding CFIUS review.

70.     When 3Com initially announced the merger, 3Com did not yet know to what extent Huawei's involvement in the deal would give rise to domestic political opposition to the merger.  3Com apparently harbored hope that Huawei's minority interest might fly under the radar screen and not provoke opposition from domestic groups.

71.     When it became apparent later on that there would be serious domestic opposition to the merger, 3Com acknowledged the inevitability of CFIUS review and took the initiative of requesting that CFIUS review the transaction.   The foregoing is based on the Boyce Affidavit, which states in paragraph 6:

> Shortly after the transaction was announced, there were a number of articles, editorials, and statements by public officials condemning any investment by Huawei in an American telecommunication company.  Some of the articles reported leaks from unnamed defense officials suggesting that Huawei had strong ties to the Chinese military and/or possible links to Chinese cyber warfare against the United States and the United States military.  Bain Capital and 3Com promptly decided to submit the 3Com transaction for CFIUS review.

20

72.     The Boyce Affidavit makes clear that the parties had originally hoped that the transaction would fly under the radar screen. But, their hopes were dashed by adverse press which highlighted the national security issues raised by the Huawei connection.

73.     The desire to fly under the radar screen would explain why 3Com used code words in the merger agreement to refer to CFIUS instead of referring to CFIUS in a straightforward manner. The desire to fly under the radar screen would also explain why 3Com emphasized in its initial press release that the merger was subject to only "customary regulatory approvals" and failed to disclose that CFIUS might block the merger based on national security concerns relating to Huawei.

74.     3Coms's executive officers had more than professional pride at stake in ensuring that the merger was completed.

75.     The Proxy Statement which 3Com filed with the SEC reveals that each of 3Com's executive officers would have reaped a financial windfall from the completion of the merger due to the vesting and cash-out of options, restricted stock and restricted stock units. The minimum expected financial gain for an executive officer was more than $1 million and in several cases the financial gain was many times that. For example, Mr. Goldman was expected to gain $3.3 million.

76.     3Com's senior officers thus had ample motive for taking actions that they believed could reduce the risk of a CFIUS review.

## RELIANCE

77.     Plaintiff Joseph Ehrenreich and Plaintiff Judy Ehrenreich are husband and wife. Plaintiff Joseph Ehrenreich has a power-of-attorney to purchase securities for his wife's account.

78.     Plaintiff Joseph Ehrenreich purchased a total of 6,000 shares of 3Com common stock for his own account. These purchases were made on September 28, 2007 (2,000 shares at $5.01 per share), October 4, 2007 (2,000 shares at $4.87 per share) and October 12, 2007 (2,000 shares at $4.88 per share).

79.     Plaintiff Joseph Ehrenreich also purchased a total of 7,000 shares of 3Com common stock for his wife's account. This purchase was made on November 12, 2007 (7,000 shares at $4.80 per share).

80.     Prior to making each of the aforementioned purchases, Plaintiff Joseph Ehrenreich did actually read and rely upon each of the misleading statements identified in paragraphs 47 through 57 above issued by 3Com prior to the date of purchase.

81.     As a result of 3Com's misleading disclosures, the Plaintiffs were not aware that there was a significant risk that the merger would be blocked by CFIUS due to national security issues relating to Huawei. More specifically, the Plaintiffs were not aware of each of the matters referred to in paragraphs 50 and 57 above which 3Com failed to disclose.

## CAUSATION

82.     3Com concealed that there was a significant risk that the merger would be blocked by CFIUS due to national security issues relating to Huawei.  More  specifically, 3Com concealed that :

> --there were serious national security issues relating to Huawei, including allegations that Huawei had strong ties to the Chinese military and/or possible links to Chinese cyber warfare against the United States and the United States military;

> --the national security issues relating to Huawei created a significant risk that CFIUS would block transaction;

> --the possibility that CFIUS would block the merger was recognized by the parties from the very beginning and was central to the negotiation of the merger agreement.

83.     On February 20, 2008, March 19, 2008 and March 20, 2008, the world learned that the exact risks that 3Com had concealed had actually materialized. Specifically, (i) on February 20, 2008, 3Com issued a press release announcing that it had encountered problems relating to CFIUS review (see ¶ 28);  (ii) on March 19, 2008, 3Com issued a press release announcing that it had been unable to resolve the problems relating to CFIUS review (see ¶ 30); and (iii)  on March 20, 2008, Bain issued a press release announcing that it was terminating the Merger Agreement because CFIUS had made clear that it would act to block the merger (see ¶¶ 32, 33).

23

84.    The press release issued by 3Com on February 20, 2008, caused the price of 3Com common stock to immediately plummet by 23% (see ¶ 29).

85.    The press releases issued on March 19 and March 20 caused the price of 3Com common stock to further plummet more than 30% over this two-day period (see ¶¶ 31, 34).

86.    Following this price decline, Plaintiff Joseph Ehrenreich sold his shares on July 30, 2008 at a price that was substantially below the price that he paid for such shares and substantially below the price that he would have received had the merger not been blocked by CFIUS due to national security concerns relating to Huawei.

87.    Plaintiff Judy Ehrenreich continues to hold her shares of 3Com stock. As a direct result of the materialization of the risks concealed by 3Com, such 3Com shares are worth substantially less than Plaintiff Judy Ehrenreich paid for such shares and substantially less than the price Plaintiff Judy Ehrenreich would have received had the merger not been blocked by CFIUS.

## COUNT 1

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5

88.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

89.    This claim is brought pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thererunder.

24

90.     Defendant, by the use and means of instrumentalities of interstate commerce, the mails and/or facilities of a national securities exchange, made untrue statements of material fact and/or omitted to state material facts necessary to make statements made not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thererunder.  These misleading statements and omissions concealed that there was a significant risk that the merger would be blocked by CFIUS due to national security issues relating to Huawei.

91.     Defendant made the false and misleading statements and omissions with scienter.

92.     As a result of Defendant's false and misleading statements and omissions, Plaintiffs were not aware of the concealed risks.

93.     Plaintiffs purchased shares of 3Com common stock in reliance on the false and misleading statements.   Had Plaintiffs been aware of the concealed risks they would not have purchased 3Com shares.

94.     The precise risks which Defendant concealed through its false and misleading statements and omissions materialized.   The materialization of these risks immediately caused the price of 3Com common stock to plummet.

95.     As a direct result of the materialization of the risks concealed by 3Com, (i) Plaintiff Joseph Ehrenreich's 3Com shares were sold at a loss and (ii) Plaintiff Judy Ehrenreich's 3Com shares are worth substantially less than Plaintiff Judy Ehrenreich paid for such shares and substantially less than the price Plaintiff Judy Ehrenreich would have received had the merger not been blocked by CFIUS.

96.     This claim was brought within two years after discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.      Awarding Plaintiffs compensatory damages.

B.      Awarding Plaintiffs pre-judgment and post-judgment interest, as well as reasonable attorneys' fees and other costs;

C.      Awarding such other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury in this action for all issues so triable.

Dated:   New York, New York
         May 11, 2009

By: _____
    Richard H. Dolan (RD 2212)
    Niall D. O'Murchadha (NO8161)
    Schlam Stone & Dolan LLP
    26 Broadway
    New York, New York 10004
    *Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
........................................................................................X
JOSEPH EHRENREICH, JUDY EHRENREICH

Plaintiffs,

v.

3COM CORPORATION,

Defendant.

.................................................................................

**Index No.:**   09 - CIV - 4487

---

# COMPLAINT

---

## SCHLAM STONE & DOLAN LLP
Richard H. Dolan, Esq.
Niall D. O'Murchadha
26 Broadway
New York, New York 10004
(212) 344-5400

*Attorneys for Plaintiff*
JOSEPH EHRENREICH and JUDY EHRENREICH